720 S.W.2d 282 (1986)
290 Ark. 375
Willie Louis JACKSON, Appellant,
v.
STATE of Arkansas, Appellee.
No. CR 86-101.
Supreme Court of Arkansas.
November 24, 1986.
*283 John H. Bradley, Deputy Public Defender, Blytheville, for appellant.
Steve Clark, Atty. Gen. by William F. Knight, Asst. Atty. Gen., Little Rock, for appellee.
NEWBERN, Justice.
The appellant was charged October 31, 1984, with rape of a child less than eleven years old by sexual intercourse and deviate sexual activity by forcible compulsion. Ark.Stat.Ann. § 41-1803 (Repl.1977). This statute has since been amended to make the "statutory rape" age less than fourteen. See Ark.Stat.Ann. § 41-1803 (Supp. 1985). The appellant was found guilty and sentenced to life imprisonment. He alleges error in allowing the victim and her five-year-old brother to testify at the trial. He also alleges it was error to have allowed the mother of the alleged victim to testify as to the alleged victim's statement made after the incident. We find no error and affirm.
The incident occurred when the mother left four children at their home with the appellant while she walked to a nearby store. The children's ages at the time were: the alleged victim, a daughter eight years old; two brothers aged six and four; and a baby aged one month. The children's testimony showed the two boys and the baby were in the back bedroom into which a television had been moved, allegedly by the appellant. The alleged victim said she was in the living room of the house when the appellant approached her with a kitchen knife and had her lie down on a bed in that room. She testified that he removed her clothes and performed oral sex on her, as well as using his fingers. This was witnessed by the two little brothers one of whom said they had crawled from the bedroom to the living room to watch. He said the appellant got a belt and forced them back into the bedroom. Testimony showed he then returned to the living room with the kitchen knife and removed his clothes and had intercourse with the alleged victim. This was also witnessed by the two little boys who had once again returned to the living room to watch, according to one of them.
The alleged victim's testimony and that of her mother showed she then washed herself and her underwear in a dishpan in the living room before her mother returned from the store. The mother testified that upon returning from the store, she immediately knew something was wrong with the alleged victim who was upset. After questioning, the alleged victim finally revealed to the mother what the appellant had done. The brothers then also confirmed what had happened. The mother confronted the appellant, and he left the house. The alleged victim was then examined by the mother and taken to the hospital. The medical report to which both sides stipulated showed that the alleged victim's hymenal ring was irritated but not broken. The mother also testified that when she examined the alleged victim after being told of the rape, she found the alleged victim's *284 vagina was irritated and red and contained blood. The medical report, which was compiled after the washing occurred, did not show any blood or sperm. The mother was allowed to testify that the alleged victim told her, "My uncle raped me" over the objection by the appellant that it was hearsay.
The alleged victim who was ten at the time of the trial testified first. She stated she knew not to tell a lie and that she should always speak the truth. She answered when asked general questions such as her name, school, and teacher's name, but when the questions turned to the incident she was very shy and reticent. She nodded her head either affirmatively or negatively in response to questions. She indicated the answer to some questions by pointing, for example, to her genital area. She finally told the judge during voir dire that she was embarrassed to tell what happened. The judge allowed the deputy prosecutor to ask leading questions.
When the brother who was five at the time of trial testified, he was equally reticent. The judge let both children testify over objections of appellant regarding their competency.
The appellant did not testify nor did he offer any witnesses on his behalf.

1. Competency of child witnesses
The question of the competency of a witness is a matter lying within the sound discretion of the trial court and, in the absence of clear abuse, we will not reverse on appeal. Kitchen v. State, 271 Ark. 1, 607 S.W.2d 345 (1980). The trial court must begin with the presumption that every person is competent to be a witness. Arkansas Rule of Evidence 601. The guidelines established by this court with respect to competency of a witness expressed in Chambers v. State, 275 Ark. 177, 628 S.W.2d 306 (1982) are:
[t]he ability to understand the obligation of an oath and to comprehend the obligation imposed by it; an understanding of the consequences of false swearing; and the ability to receive accurate impressions and to retain them, to the extent that the capacity exists to transmit to the fact finder a reasonable statement of what was seen, felt or heard. [275 Ark. at 179, 628 S.W.2d at 307, quoting Kitchen v. State, supra.]
The issue of competency of a witness is one in which the trial judge's evaluation is particularly important due to the opportunity he is afforded to observe the witness and the testimony. Clifton v. State, 289 Ark. 63, 709 S.W.2d 63 (1986).
As long as the record is one upon which the trial judge could find a moral awareness of the obligation to tell the truth and an ability to observe, remember and relate facts, we will not hold there has been a manifest error or abuse of discretion in allowing the testimony. Hoggard v. State, 277 Ark. 117, 640 S.W.2d 102 (1982); Chambers v. State, 275 Ark. 177, 628 S.W.2d 306 (1982). [289 Ark. at 65, 709 S.W.2d at 64.]
In a child rape case, the matter of the competency of the child is primarily for the trial judge to decide, as he is better able than we to judge the child's intelligence and understanding of the necessity for telling the truth. Needham v. State, 215 Ark. 935, 224 S.W.2d 785 (1949).
In Harris v. State, 238 Ark. 780, 384 S.W.2d 477 (1964), we said that, as the trial judge is given wide discretion in making the determination of competency, absent clear abuse, we will not disturb that ruling on appeal. There we reversed the trial judge's finding of competency because of the direct conflicts and irreconcilable differences throughout the six-year-old girl's testimony. We said it was the duty of the trial judge throughout the testimony of such a witness to evaluate the competency of the witness and not just rely upon his preliminary decision. In the present case there are no direct conflicts or irreconcilable differences in the testimony of the victim or that of her brother, and in fact there is harmony between the two children's testimony regarding what happened.
*285 During the direct examination of each child witness there were many questions asked which went unanswered. The judge held a voir dire of both witnesses after their testimony had begun, to evaluate further their competency and found that they were competent. We approved of this procedure in Hamblin v. State, 268 Ark. 497, 597 S.W.2d 589 (1980). See also Hoggard v. State, 277 Ark. 117, 640 S.W.2d 102 (1982).
Our cases do not hold that below a certain age a witness cannot testify. We have allowed a child as young as six to testify and approved a finding of competency where the trial court made the determination based on the guidelines noted above. Hoggard v. State, supra.
The practice of examining a child witness through leading questions has been approved by us as being within the sound discretion of the trial judge. Bullen v. State, 156 Ark. 148, 245 S.W. 493 (1922); Hamblin v. State, supra. The age and shyness of the witness are important factors to be considered. Murray v. State, 151 Ark. 331, 236 S.W. 617 (1922); Hamblin v. State, supra. We approve of this procedure in child rape cases because of (1) the seriousness of the crime, (2) the natural embarrassment of the witness about the incident, (3) the child's fear of being in a courtroom full of people, (4) the necessity of testimony from a victim, (5) threats toward victims from these perpetrators, and (6) to avoid the possibility that an accused might escape punishment for a serious offense simply because of the victim's reluctance to testify. Hamblin v. State, supra. We commended the judge for his patience in that case in trying to search for the truth. Similar patience was demonstrated in this case. If it appears necessary to lead a child witness to elicit the truth we will affirm the judge's allowing leading questions absent an abuse of discretion. Crank v. State, 165 Ark. 417, 264 S.W. 936 (1924); Hamblin v. State, supra. See also West v. State, 209 Ark. 691, 192 S.W.2d 135 (1946).
As the dissenting opinion observes, the testimony of the victim and her little brother was interspersed with agonizing pauses. It may be the most extreme case of witness reluctance and leading we have seen. However, when all was said and done, these excerpts from the direct testimony of the victim stand out:
Mr. Bearden [Prosecutor]: Did he have something in his hand, ...?
Note: Witness nods affirmatively.
Mr. Bearden: What, do you remember?
Note: Witness nods affirmatively.
Mr. Bearden: What was it?
Note: No audible response.
Mr. Bearden: Do you remember what it was?
Note: Witness nods affirmatively.
Mr. Bearden: What was it? Tell me.
Note: No audible response.
Mr. Bearden: Just look up and tell me. What was it?
Witness: Case knife.
. . . . .
Mr. Bearden: His what? What did he touch you with?
Witness: His(long pause)
Mr. Bearden: His what?
Witness: His tongue.
. . . . .
Mr. Bearden: Can you point and show me where his head was?
Note: Witness points.
Mr. Bearden: You are pointing down between your legs?
Note: Witness nods affirmatively.
Mr. Bearden: Yes?
Witness: Yes.
. . . . .
Mr. Bearden: Could you feel him touching your private parts with his tongue,...?
Witness: Yes.
. . . . .
Mr. Bearden: Did you see his private parts?
Witness: Yes.
Mr. Bearden: Yes? Did he touch you with his private parts, ...?

*286 Witness: Yes.
Mr. Bearden: Did he hurt you?
Note: Witness nods affirmatively.
Mr. Bearden: Yes?
Witness: Yes.
. . . . .
Mr. Bearden: Could you feel his private parts inside your private parts, ...?
Witness: Yes.
. . . . .
Similar exerpts could be presented from the testimony of the victim's little brother. There were the same excruciating repetitions and long pauses, but he ultimately said his uncle, the appellant, "put his hand down there," referring to his sister's private parts, and he responded "Yes, sir" when asked if he had seen the appellant put his private part between the victim's legs.
We find no error by the trial judge on this point.

2. Mother's testimony
The objection to the mother's testimony raised in this point occurred when she was asked by the deputy prosecutor: "What did she [the alleged victim] say to you?" The defense objected on the ground of hearsay, was overruled, and the mother responded, "She told me `my uncle raped me.'"
This statement by the alleged victim made as her mother confronted her just after the incident comes into evidence under the exception to the hearsay rule found in Ark.R.Evid. 803(2), which reads:

Hearsay ExceptionsAvailability of declarant immaterial. The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or conditions.
In Bryan v. State, 288 Ark. 125, 702 S.W.2d 785 (1986), we held that the father of a six-year-old boy could testify as to what the son told him after the incident when the father questioned him regarding the sexual offense allegedly committed on him by the appellant because it was an excited utterance under Unif.R.Evid. 803(2) which is now the Arkansas rule. We also allowed this type of testimony in other rape cases for the same reason. See Fountain v. State, 273 Ark. 457, 620 S.W.2d 936 (1981). It has been approved in child sexual offense cases as well. See Weaver v. State, 271 Ark. 853, 612 S.W.2d 324 (Ark. App. 1981); Green v. State, 7 Ark.App. 175, 646 S.W.2d 20 (1983).
As the introduction of evidence is a matter within the sound discretion of a trial judge, in the absence of abuse of that discretion we will not reverse. Hamblin v. State, supra.

3. Sufficiency of the evidence
The appellant was charged with rape by sexual intercourse and deviate sexual activity under Ark.Stat.Ann. § 41-1803 (Repl. 1977), which was in effect in 1984, as follows:
(1) A person commits rape if he engages in sexual intercourse or deviate sexual activity with another person:
(a) by forcible compulsion, or ...
(b) who is less than eleven (11) years old.
Those terms were defined in Ark.Stat. Ann. § 41-1801 (Repl.1977) as follows:
(1) `deviate sexual activity' means any act of sexual gratification involving:
(b) the penetration, however, slight, of the vagina or anus of one person by any body member or foreign instrument manipulated by another person.
(9) `sexual intercourse' means penetration, however slight, of a vagina by a penis.
The evidence of penetration by either the appellant's tongue, finger, or penis comes from the testimony of the victim and her brother, which is corroborated by the stipulated medical report. The appellant raised this objection by a directed verdict *287 motion for acquittal based upon insufficient evidence of penetration. On appeal we view the evidence in the light most favorable to the party against whom the motion is made, and a directed verdict is only proper when there is no substantial evidence from which a jury could possibly find for the non-moving party. Norton v. State, 260 Ark. 412, 540 S.W.2d 588 (1976); Williams v. State, 260 Ark. 457, 541 S.W.2d 300 (1976).
The testimony of the alleged victim which shows penetration is enough for conviction. Stevens v. State, 231 Ark. 734, 332 S.W.2d 482 (1960). Penetration can be shown by circumstantial evidence, and if that evidence gives rise to more than a mere suspicion, and the inference that might reasonably have been deduced from it would leave little room for doubt, that is sufficient. Whitmore v. State, 263 Ark. 419, 565 S.W.2d 133 (1978).
The victim here testified to penetration by the appellant's tongue, finger and penis. This was corroborated somewhat by the testimony of the brother and the stipulated medical report regarding the hymenal ring irritation. The alleged victim's testimony need not, however, be corroborated to be sufficient. Brewer v. State, 269 Ark. 185, 599 S.W.2d 141 (1980); Urquhart v. State, 273 Ark. 486, 621 S.W.2d 218 (1981); Smith v. State, 277 Ark. 64, 639 S.W.2d 348 (1982); Lackey v. State, 283 Ark. 150, 671 S.W.2d 757 (1984); Kitchen v. State, supra.
Even though the child may not use the correct terms for the body part but instead uses his own terms or demonstrates a knowledge of what and where those body parts referred to are, that will be sufficient to allow the jury to believe that the act occurred. Needham v. State, 215 Ark. 935, 224 S.W.2d 785 (1949).
As there was sufficient evidence of penetration given by the alleged victim and her brother, the judge properly denied the appellant's motion for directed verdict.

4. Speedy trial
The appellant was arrested on September 3, 1984, and evaluated under orders of the trial court on two different occasions for competency. On October 14, 1985, the appellant filed a motion to be released from custody because of a violation of Rule 28.1 of Arkansas Rules of Criminal Procedure, which reads:
(a) Any defendant charged with an offense in circuit court and incarcerated in a city or county jail in this state pending trial shall be released on his own recognizance if not brought to trial within nine (9) months from the time provided in Rule 28.2, excluding only such periods of necessary delay as are authorized in Rule 28.3.
(b) Any defendant charged with an offense in circuit court and incarcerated in prison in this state pursuant to conviction of another offense shall be entitled to have the charge dismissed with an absolute bar to prosecution if not brought to trial within twelve (12) months from the time provided in Rule 28.2, excluding only such periods of necessary delay as are authorized in Rule 28.3.
The appellee admits the appellant was incarcerated for 284 days, in violation of Rule 28.1(a). The appellant urges us to apply the remedy found in Rule 28.1(b). We decline to do so because Rule 30.1(b) states that discharge is not a remedy for this violation. See Bell v. State, 270 Ark. 1, 603 S.W.2d 397 (1980); Matthews v. State, 268 Ark. 484, 598 S.W.2d 58 (1980).
Subsection (a) is mandatory, but if a judge refuses to release a defendant after nine months as provided in the rule, the remedy is to seek a writ of mandamus from this court. Cash v. State, 271 Ark. 881, 611 S.W.2d 510 (1981); Bell v. State, supra; Mackey v. State, 279 Ark. 307, 651 S.W.2d 82 (1983).
We have held that bail and release violations are not the sort for which we will reverse an otherwise valid conviction. Orsini v. State, 281 Ark. 348, 665 S.W.2d 245 (1984).
*288 As we are required to do in any case in which a life imprisonment sentence has been imposed, we have reviewed all objection abstracted by the appellant which were decided against him in the trial court, and we have found no error.
The judgment is affirmed.
PURTLE, J., dissents.
PURTLE, Justice, dissenting.
In my opinion neither the alleged victim nor her five year old brother "testified" in this case. The mother of the alleged victim ramrodded the whole proceeding. It was the prosecutor who testified more than anyone else. The only way to portray the testimony accurately, or the lack thereof, is to set it out verbatim. While the alleged victim was on the stand, the following questions were asked by the prosecutor:
MR. BEARDEN: Julie, if you could, I want you to in your own words, and talking loud enough so these ladies and gentlemen over here can hear you, tell them what happened after your mother left.
NOTE: Long pause, no audible answer.
MR. BEARDEN: Nobody is going to hurt you. Just talk to the jury and tell them what you remember.
NOTE: Long pause, no audible answer.
MR. BEARDEN: What did your W.L. do? (Tr. 129-130)
NOTE: Long pause, no audible answer.
MR. BEARDEN: Can you look at the jury and tell them what he did? Nobody is going to hurt you. Just tell the truth.
NOTE: Long pause, no audible answer.
MR. BEARDEN: Julie, look at me. Tell these ladies and gentlemen what you remember about that night.
NOTE: Long pause, no audible answer.
MR. BEARDEN: Your momma went to get some Pampers, right?
NOTE: Witness nods head affirmatively.
MR. BEARDEN: Where were Sidney and Edward?
WITNESS: At home.
MR. BEARDEN: Huh?
WITNESS: At home.
MR. BEARDEN: At home? What room were they in?
WITNESS: In the bedroom.
MR. BEARDEN: Can you talk up just a little bit?
WITNESS: In the bedroom.
MR. BEARDEN: In the bedroom? Where was Uncle W.L.?
WITNESS: In the front.
MR. BEARDEN: In the front? Where were you?
WITNESS: In the front.
MR. BEARDEN: In the front? How did your two brothers get back into the bedroom?
NOTE: Long pause, no audible response.
MR. BEARDEN: Did somebody put them back there?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Who put them back there?
NOTE: No audible response.
MR. BEARDEN: Remember who put them back there?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Who?
WITNESS: Uncle W.L.
MR. BEARDEN: Uncle W.L.? Is that what you said?
WITNESS: Yeah.
MR. BEARDEN: Okay. What happened after W.L. came into the front room with you?
NOTE: Long pause, no audible response.
MR. BEARDEN: Just look up at me and just tell what you remember about it. Okay?
NOTE: Long pause, no audible response.
MR. BEARDEN: Tell me what you remember about it?
NOTE: Long pause, no audible response.
*289 MR. BEARDEN: Does it embarrass you to talk about it?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Julie, this won't take long. Just look at these ladies and gentlemen over there and tell then what happened.
NOTE: Long pause, no audible response.
MR. BEARDEN: Did he do something?
NOTE: Witness nods affirmatively. (Tr. 131-132)
MR. BEARDEN: Yes?
WITNESS: Yes.
MR. BEARDEN: What did he do?
NOTE: Long pause, no audible response.
MR. BEARDEN: Do you remember?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Just tell these ladies and gentlemen what you remember.
NOTE: Long pause, no audible response.
MR. BEARDEN: Can you look up at me?
WITNESS: Uh-huh.
MR. BEARDEN: Nobody is going to hurt you. Tell me what happened.
NOTE: Long pause, no audible response.
MR. BEARDEN: Can you remember?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Just go ahead and tell me what happened so that they can hear you.
NOTE: Pause, no audible response.
MR. BEARDEN: Did he say anything to you?
NOTE: Witness nods affirmatively.
MR. BEARDEN: What did he say?
NOTE: Pause, no audible response.
MR. BEARDEN: Do you remember?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Just tell the jury what you remember?
WITNESS: He said(Tr. 132-133)
MR. BEARDEN: What did he say?
WITNESS: He said
MR. BEARDEN: He said if what?
WITNESS: If(long pause)
MR. BEARDEN: What did he say?
WITNESS: If you(long pause)
MR. BEARDEN: He said if what?
NOTE: No audible response.
MR. BEARDEN: Look at the jury and tell them what he said.
NOTE: Long pause, no audible response.
MR. BEARDEN: Just tell them the truth.
WITNESS: He said if I(pause)
MR. BEARDEN: If you what?
WITNESS: He said(pause)
MR. BEARDEN: Go ahead and tell us what happened. Nobody is going to hurt you.
NOTE: Long pause, no audible response.
MR. BEARDEN: Did he say anything to you about what he was going to do if you told anybody?
NOTE: Witness nods affirmatively.
MR. BEARDEN: What did he say about that?
WITNESS: He said(long pause)
MR. BEARDEN: What did he say about it?
WITNESS: He said that if I said something(pause)
MR. BEARDEN: If you said something what was he going to do?
NOTE: No audible response.
MR. BEARDEN: Did he have something in his hand, Julie?
NOTE: Witness nods affirmatively.
MR. BEARDEN: What, do you remember?
NOTE: Witness nods affirmatively.
MR. BEARDEN: What was it?
NOTE: No audible response.
MR. BEARDEN: Do you remember what it was?
NOTE: Witness nods affirmatively.
MR. BEARDEN: What was it? Tell me.
NOTE: No audible response.
*290 MR. BEARDEN: Just look up and tell me. What was it?
WITNESS: Case knife.
MR. BEARDEN: Case knife?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Did he have it in his hand?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Let me show you this, Julie. Does this look like what you are talking about?
WITNESS: Yeah.
MR. BEARDEN: Is that the kind of knife you are talking about?
NOTE: Witness nods affirmatively.
MR. BEARDEN: What did he say he would do with it if you told anybody?
NOTE: Long pause, no audible response. (Tr. 134-135)
MR. BEARDEN: Did he say he would hurt you?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Okay. Did he hand this in his hand?
WITNESS: Yes.
MR. BEARDEN: Did it scare you?
NOTE: Witness nods affirmatively.
MR. BEARDEN: What did he do after that, Julie?
NOTE: No audible response.
MR. BEARDEN: Do you remember lying down?
NOTE: Witness nods affirmatively.
MR. BEARDEN: Did you have your clothes on?
NOTE: Witness shakes head negatively.
MR. BEARDEN: No? How did they get off?
NOTE: Long pause, no audible response.
MR. BEARDEN: Look up at me and tell me. This won't take very long. How did they get off?
WITNESS: He(long pause)
MR. BEARDEN: Tell me. Did Uncle W.L. have anything to do with your clothes?
NOTE: No audible answer.
MR. BEARDEN: Julie, did he, yes or no?
WITNESS: Yes.
MR. BEARDEN: Huh?
WITNESS: Yes.
MR. BEARDEN: Is that what you said, yes? (Tr. 135-136)
NOTE: Witness nods affirmatively.
MR. BEARDEN: What did he do with your clothes, Julie?
NOTE: No audible response.
It is clear from the above excerpt that this witness was unwilling to answer a question and did not know why she was in court.
It is also necessary to set out a sample of the state's questions of Edward Brown, the five year old, and his responses.
MR. BEARDEN: How old are you?
WITNESS: Five.
MR. BEARDEN: You are five? You can talk louder than that, can't you? How old are you?
WITNESS: Five.
MR. BEARDEN: Atta boy. How did you get here today?
NOTE: No audible response.
MR. BEARDEN: Did you drive or walk?
WITNESS: We drived.
MR. BEARDEN: You drove?
NOTE: Witness shakes head negatively.
MR. BEARDEN: How did you get here?
NOTE: No audible response.
MR. BEARDEN: Come on, sit up here. Answer my questions. Sit up straight. How did you get over here today?
WITNESS: We walked.

* * * * * *
MR. BEARDEN: What is your teacher's name?
NOTE: Pause, no audible response.
MR. BEARDEN: Did you forget?
NOTE: Witness nods affirmatively.
MR. BEARDEN: What grade are you in?
*291 WITNESS: In kindergarten.
MR. BEARDEN: Kindergarten? Is this your first year in school?
WITNESS: Yes, sir.
MR. BEARDEN: Yes?
WITNESS: Yes, sir.
MR. BEARDEN: Alright. I want you to look up here at me, Edward. When is your birthday?
WITNESS: In January.
MR. BEARDEN: When?
WITNESS: January.
MR. BEARDEN: January?
NOTE: Witness nods affirmatively.
MR. BEARDEN: How far can you count? Show these ladies and gentlemen how good you can count.
WITNESS: 1, 2,
MR. BEARDEN: Can you count to ten, Edward?
WITNESS: No.
MR. BEARDEN: That was good. Where do you live?
WITNESS: 7 and ½ Dixon.
MR. BEARDEN: Where?
WITNESS: 7 and ½ Dixon.
MR. BEARDEN: 207 and ½ Dixon?
WITNESS: Yeah.
MR. BEARDEN: Is that what you said?
WITNESS: Yeah.
MR. BEARDEN: I want you to look up now, Edward and talk straight to me so that these people can hear you. Who lives there with you.
WITNESS: My baby.
MR. BEARDEN: Your baby? Who else?
WITNESS: And my sister.
MR. BEARDEN: And did I ask you to come in here and tell the truth?
WITNESS: Yes, sir.
MR. BEARDEN: Did I try to get you to say something that wasn't true?
WITNESS: No, sir.
MR. BEARDEN: Did I ask you to just come in here and say what you remember?
WITNESS: Yes, sir.
MR. BEARDEN: Is that what you intend to do today?
WITNESS: Yes, sir. (Tr. 158-159)
MR. BEARDEN: Do you understand that if you were to tell something wrong that wasn't true, you might get into trouble?
WITNESS: No, sir.
MR. BEARDEN: Huh?
WITNESS: No, sir.
MR. BEARDEN: You don't know that you might get into trouble if you tell a lie?
NOTE: Witness shakes head negatively.
The defense counsel cross-examined this witness in part as follows:
MR. BRADLEY: Do you know what you are in the courtroom for?
NOTE: Witness nods affirmatively. (Tr. 160-161)
MR. BRADLEY: What is that for?
NOTE: Witness shrugs shoulders.
MR. BRADLEY: You shrugged your shoulders. Do you know why you are in the courtroom?
NOTE: Witness shakes head negatively.
MR. BRADLEY: You are shaking your head no?
NOTE: No audible response.
MR. BRADLEY: You don't know why you are in this Courtroom?
NOTE: Witness shakes head negatively.
MR. BRADLEY: You are shaking your head from left to right, no.
MR. BRADLEY: No further questions. I have the same objection here, Your Honor.
Therefore, during the cross-examination it was confirmed that this five year old witness did not know why he was in court.
More than 40 pages of testimony of these two young witnesses are abstracted. In all of this testimony there is no positive, unassisted testimony by either child which indicates that they were giving voluntary or positive testimony. The mother and *292 prosecutor, through the mouths of these babies, did eventually coach them into "yes" or "no" answers on direct examination. This coerced testimony is insufficient to support the convictions.
The troublesome part of this case is that there is no supporting evidence to corroborate the alleged victim's forced testimony. To the contrary, the examining doctor found the hymenal ring unbroken. Without breaking the hymenal ring, it is impossible to penetrate the vagina. This little girl is still a virgin. The crime lab report was negative for blood, hair, and semen. The mother testified clearly and unequivocally that she saw bleeding from the vagina. Such unfounded testimony may well have influenced the jury. It would have indeed been useless for the appellant to use a case knife to threaten the eight year old child. The five year old witness testified that he had a baby in the home.
The above errors are only a sample of the many which I find in this trial. Of all the cases cited in the majority opinion none is factually similar to the present case. The age of the children is the only similarity. The testimony given by these two witnesses, without the assistance of the prosecutor, was not sufficient to support a verdict of guilt. The testimony of the mother was either hearsay or opinion. I would reverse and remand because of the hearsay testimony of the mother and the prosecutor's testimony through the children.