Cite as 2023 Ark. App. 70

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CR-21-254

| | | |
|---|---|---|
| LOGAN MORRISON | | Opinion Delivered February 15, 2023 |
| | APPELLANT | |
| | | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CR-19-2471] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE BRADLEY L. KARREN, JUDGE |
| | | REVERSED AND REMANDED |

## RITA W. GRUBER, Judge

A Benton County jury convicted appellant Logan Morrison of rape and aggravated assault.[1] Appellant challenges the sufficiency of the evidence to support both convictions. Alternatively, he argues that the case should be reversed and remanded for a new trial because the circuit court erroneously gave Arkansas Model Jury Instruction–Criminal 206. We reverse and remand.

The trial took place over several days in October 2020. KP testified that she was homeless in October 2019 and struggled with drugs and alcohol. KP said that on October 3, 2019, she left a friend's hotel room and planned to sleep behind a phone store when she

---

[1]This is the second time this case has been before us. In *Morrison v. State*, 2022 Ark. App. 131, we remanded the case to settle and supplement the record and to correct deficiencies in the electronic record.

met appellant, who identified himself as Kyle. He offered her a bottle of water and a sandwich. He told her he had a tent set up nearby where she could spend the night because it was going to storm and was cold. KP said that she was desperate, and appellant had a nice enough demeanor and did not seem like he was going to harm her. She also felt like she could defend herself because she carried a knife in her backpack and thought she could get away if necessary. KP said that when she got to the tent, she took her shoes off and went inside. She was furthest from the door. She took a shot of whiskey she got from a friend earlier that day and covered herself with a blanket belonging to appellant. KP had used methamphetamine that morning but was "coming down" at that point.

According to KP, appellant was "kind of laying back" but not "fully laying down" by the zipper part of the tent and was watching something on his phone. KP testified that she started to get comfortable and fall asleep when appellant rolled over and put his arm around her. This made her uncomfortable and she told him "not to do that." Appellant responded by taking his arm off her. The next thing she remembered about the evening was waking up to thunder and lightning, and she was "throwing up bad." She had vomit in her hair and all over her clothes. She stated that she passed back out and did not wake up again until the morning, at which point she threw up again and was panicked, explaining that she woke up with no pants on and was covered only by a blanket. She did not recall anyone touching her. With the blanket around her, she tried to gather her belongings, crawled out of the tent, and started "running toward the road, stumbling." She was scared and did not know if appellant was coming back. Her vision was messed up, and she was really shaky. A woman stopped to

help her, and she was taken to the hospital by ambulance. She recalled identifying appellant in a photo lineup and was confident in her identification.

KP described her body feeling "[v]ery uncomfortable. My tongue hurt very badly. It had teeth marks in it, very swollen. My throat was hurting from being strangled. My eye was hurting. It was bruised and swollen shut pretty much. There was some pressure down there in my vagina[l] area." KP believed she had been raped because of the way her body felt. She stated that she did not take her pants off before she went inside the tent, only her shoes.

On cross-examination, KP said she had used methamphetamine the previous night and had stayed in a hotel with a friend named Alexander. She stated that she did not have any injuries to her body before she went to sleep in appellant's tent. She recalled she was lying on her stomach when she woke up vomiting. She described herself as "pretty out of it" when she woke up and did not recall being choked or penetrated.

Courtney Fields testified that after she dropped her daughter off at school, she saw KP standing in the middle of Cypress Street in Rogers trying to flag down cars. She said that KP had a small blanket wrapped around her waist and was screaming and crying for help. KP "looked horrible . . . like something had happened to her." She said that KP was not wearing underwear or pants; her eye was bruised and swollen; her tongue was swollen and appeared to be sticking out of her mouth; she had blood and vomit all over her face; and she was struggling to speak. Fields described KP as terrified and in distress. Fields pulled over, called 911, and stayed with KP until help arrived.

Joshua Kirts of the Rogers Fire Department testified that he responded to the 911 call. When he first encountered KP, she looked like she had been "beaten up pretty good." She was able to walk to the back of the ambulance, and she was taken to the hospital. He stated she had an injury to her eye, which was "pretty much swollen shut." He said her lips and tongue were also swollen, and she had "marks and abrasions around her neck." He stated that KP said she had been "beaten and sexually assaulted" and thought she had been raped. He said KP was apprehensive and seemed traumatized. KP told Kirts that she had met a man the night before named Kyle and went a tent that was nearby.

Detective James Keck of the Rogers Police Department testified that he was called on the morning of October 4 to watch and be on the lookout for anyone approaching the tent. Around 9:15 a.m., a male approached the doorway of the tent. An audio recording of Keck's conversation with appellant was introduced and played for the jury. The audio recording indicates that appellant initially asked Keck who owned the tent, and Keck responded, "You're staying there, aren't you?" Appellant denied that he was staying there and said that there was man and a woman there the previous night. He stated he had followed them and saw them going through a black bag and dispose of a bowie knife at a nearby building around 2:00 in the morning. He told Keck he had put up the tent but had not been staying there, explaining that his legs are "messed up," he can't get on his knees, and he sleeps on a porch in a chair. Appellant also said that someone left a mess at the tent and "stuff" had been stolen. He denied being there with a girl the previous day.

4

Sergeant Eddie Weimer of the Rogers Police Department was the lead investigator in the case. After speaking to KP at the hospital and learning she had ligature marks on her neck, he and Detective Taylor returned to the tent to look for additional evidence of strangulation. Detective Keck was still watching the area. Within minutes of returning to the tent, the officers made contact with appellant. Sergeant Weimer's testimony about their encounter with appellant tracked the audio recording. Sergeant Weimer explained appellant changed his story when appellant took them to the dumpster where he claimed to have seen the man and woman discard something, and Detective Taylor pointed out that there were surveillance cameras above a loading dock where they were sitting. Sergeant Weimer testified that appellant told them he had met KP there and did take her to the tent but left. Further, Sergeant Weimer stated that their investigation of the tent revealed a white nylon rope. The officers concluded their investigation and left. Later, Sergeant Weimer said that appellant reached out and asked to speak to him.

At this second meeting, appellant indicated that he had read the police report and wanted to clear up the inaccuracies. Sergeant Weimer and Detective Taylor interviewed appellant twice, and the audio recordings were played for the jury. In the first part of the interview, appellant admitted that he had taken KP to his tent and got inside with her. Appellant said that after KP fell asleep, he stole her backpack and left. In the second part of the interview, appellant indicated that it was possible that he could have strangled KP if her backpack, which was lodged on something, had been around her neck. He said he weighs 350 pounds and had to pull pretty hard for three minutes before it was free.

Dr. Danelle Richards, who treated KP in the emergency room, testified that KP had bruising to her left eye, ligature marks on the front of her neck, and her tongue was swollen. She described KP as being anxious, quiet, tearful, and scared. KP told Dr. Richards that she had pain in her chest and right hip and that she had been physically assaulted and possibly sexually assaulted. Dr. Richards testified that in her experience, the ligature marks on KP were indicative of strangling. Dr. Richards stated KP tested positive for marijuana and methamphetamine but that KP did not seem to be under the influence. KP's blood-alcohol content would be considered zero. KP told Dr. Richards that she had been drinking alcohol and may have been drugged. Dr. Richards thought KP's allegation of assault was credible based on her injuries, appearance, and demeanor and things KP said.

Kacie Parrish, sexual assault nurse examiner (SANE), testified that there were two ligature marks on KP's neck, which were consistent with strangulation. In addition to the ligature marks, Parrish said there were other injuries consistent with strangulation, including petechiae, which occurs when the jugular veins are occluded in strangulation, and the blood can go into the head but cannot come back out. The pressure then builds up and causes the blood vessels to rupture, which looks like speckled red dots called petechiae. Parrish testified that this could lead to unconsciousness. Parrish also stated that the bite marks on KP's tongue and hemorrhaging in both of her eyes are also consistent with strangulation. Trauma, including biting one's tongue, can occur from the victim's pulling away from whatever was on the victim's neck. She said strangulation can also induce vomiting.

Parrish testified that KP indicated she was in pain during the genital exam, explaining when she swabbed the vestibule area, which is the internal structure beyond the labia majora, KP jumped, pulled away, was tense, and stated that it was painful. Parish explained that KP had normal genital findings, stating that "it's normal to be normal" because the tissue is made to withstand a lot of trauma, friction, and stretching and heals quickly. Parrish said that a victim is less likely to have injury if she was unconscious because there is no tension in the body, indicating there is less friction and less resistance. Parrish also took swabs of KP's external genital area, including the labia majora and the mons pubis, which she explained is a "high traffic area for a lot of friction during sexual intercourse or sexual assault." As a result, this area is swabbed, and evidence is collected because of the chance for "touch DNA."

On cross-examination, Parrish said that her report indicates KP's lapse of consciousness and KP's statement that she was "completely blacked out." A box was also checked "yes" next to "penetration of vagina by penis." Parish indicated that at some point, KP said she had been penetrated or at least thought that was what had occurred. In addition, the report reflects that KP had consensual intercourse within the previous ninety-six hours on October 2, 2019, and the box was checked that a condom had been used. Parrish agreed that her note reading "client has significant pain/discomfort with light touch of swabs in the vestibule" is a subjective finding.

Kent Keedy, a forensic serologist with of the Arkansas State Crime Laboratory, tested KP's clothes, which tested negative for blood and semen.

7

Jonathon Kordsmeier, a DNA analyst with the Arkansas State Crime Laboratory, testified that two different male DNA profiles were recovered from the cervix and vestibule swabs, which was consistent with KP's statement that she had recent consensual sex. Kordsmeier said there was not enough DNA to specifically identify the male contributors or differentiate between them. Kordsmeier testified that external mons pubis swabs from KP were submitted for Y-STR testing from which they were able to develop a profile with a statistical relevance to an individual in the case. He stated that the Y-STR profile from the swab identified as Q10 matched the Y-STR profile obtained from appellant, meaning that a percentage comparison excluded 99.12 percent of all male individuals other than appellant and his paternally related male relatives as the contributor.

After the State rested, appellant moved for directed verdict on both counts. As for rape, appellant argued that the State failed to prove that he engaged in sexual intercourse or deviate sexual activity with KP or that it was done by forcible compulsion. As for aggravated assault, appellant argued that the State only had the "aftereffects evidence" of injuries to KP and that "if he did do any of this" that he did so without the requisite intent. The court denied the motion.

After the directed verdict and before the defense called its only witness, the State informed the court that it wanted to include a jury instruction on the lesser-included offense of second-degree sexual assault. Defense counsel had no objection. After calling Sergeant Weimer to further inquire about the investigation, the defense rested and renewed its motion for directed verdict, adding an argument on the lesser-included offense of sexual

8

assault. Appellant's argument was the same, except changing penetration to sexual contact—that the State had failed to produce evidence of sexual contact from appellant directly to KP. The court denied the renewed motion. The jury found appellant guilty of rape and sexual assault and sentenced him as a habitual offender to serve sixty years' imprisonment for rape and twelve years' imprisonment for aggravated assault. This appeal followed.

Appellant challenges the sufficiency of the evidence to support the convictions. Alternatively, he argues that the case should be reversed and remanded for a new trial because the circuit court erroneously gave Arkansas Model Jury Instruction–Criminal 206. When an appellant challenges the sufficiency of the evidence, we review the sufficiency arguments prior to a review of any alleged trial errors. *Bynum v. State*, 2021 Ark. App. 298, 626 S.W.3d 154.

## I. *Sufficiency of the Evidence*

Appellant argues that there was insufficient evidence to convict him of either rape or aggravated assault. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Young v. State*, 374 Ark. 350, 354, 288 S.W.3d 221, 224 (2008). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.* Furthermore, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the

defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Upon review, this court must determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Id.*

## A. Rape

A person "commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person . . . [b]y forcible compulsion[.]" Ark. Code Ann. § 5-14-103 (a)(1) (Supp. 2021). "Sexual intercourse means penetration, however slight, of the labia majora by a penis." Ark. Code Ann. § 5-14-101(13) (Supp. 2021). "Deviate sexual activity" includes "any act of sexual gratification involving . . . [t]he penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person[.]" Ark. Code Ann. § 5-14-101(1)(b). "Forcible compulsion" means "physical force or a threat, express or implied, of death or physical injury to or kidnapping of any person." Ark. Code Ann. § 5-14-101(3).

Our appellate courts have repeatedly held that the uncorroborated testimony of a rape victim that shows penetration is sufficient evidence for a conviction. *Lamb v. State*, 372 Ark. 277, 275 S.W.3d 144 (2008). Circumstantial evidence can support a finding of guilt in a criminal case if it excludes every other reasonable hypothesis consistent with innocence. *Marshall v. State*, 94 Ark. App. 34, 37–38, 223 S.W.3d 74, 78 (2006). Further, "[p]enetration can be shown by circumstantial evidence, and if that evidence gives rise to more than a mere suspicion, and the inference that might reasonably have been deduced from it would leave

little room for doubt, that is sufficient." *Tinsley v. State*, 338 Ark. 342, 346, 993 S.W.2d 898, 900 (1999) (quoting *Jackson v. State*, 290 Ark. 375, 385, 720 S.W.2d 282, 287 (1986)). Whether the evidence excludes every other reasonable hypothesis consistent with innocence is for the jury to determine. *Marshall*, *supra*.

Appellant argues that the State failed to present substantial evidence of penetration. He argues that because KP had no memory and told Nurse Parrish that she was completely blacked out, this case could not be established on the rape victim's testimony alone. He further argues that the record in this case lacks sufficient circumstantial evidence of sexual intercourse or deviate sexual activity. He argues that Parrish's report is inconsistent because it notes that KP was blacked out yet indicates that KP relayed that her vagina was penetrated by a penis. The report also notes that KP was uncertain of whether other acts of penetration occurred, such as being anally penetrated, digitally penetrated, or penetrated by an object. Appellant contends that because KP was "completely blacked out," Parrish's report amounts to pure speculation. Although appellant recognized that KP complained of pain or discomfort in her genital area, he states that Parrish's anogenital examination of KP cannot support a finding of penetration because she found the examination to be normal with no evidence of trauma or sexual injury. Appellant points out that no semen was discovered on the items tested and that the DNA did not establish proof of penetration by the appellant because the internal samples revealed two unknown male contributors. Appellant states that the DNA "from which [appellant] and his male relatives cannot be excluded" found on the mons pubis of KP is not circumstantial evidence sufficient to support a finding of sexual

11

intercourse or deviate sexual activity. His reasoning is that the source of the DNA is unknown in that it could have been transferred from sneezing or another surface from which DNA may transfer, noting that KP was sleeping in a small tent full of his bedding and belongings.

The State, on the contrary, argues that KP's inability to remember what occurred inside the tent does not dictate the conclusion that it failed to prove penetration. It notes that KP identified appellant both in a photo lineup and at trial as the person she believed had beaten and raped her; appellant put his arm around her in the tent (which he removed when she said no) prior to blacking out; KP awoke to discover that she was naked from the waist down; and KP told the paramedic, the emergency-room physician, and the SANE that she believed she had been raped while unconscious. The State also points to Parrish's testimony that KP experienced "significant" pain when lightly swabbed beyond the labia majora. The State contends that Parrish's testimony that the lack of genital injuries was not inconsistent with sexual assault when a victim is unconscious because the victim is less likely to have an injury. Finally, the State argues that the male DNA evidence consistent with appellant and his paternal relatives found on the swab from KP's mons pubis is significant because Parrish testified that this area is swabbed because of the amount of friction that tends to occur in this area during sexual intercourse, and sexual assault increases the likelihood of DNA being found there. The State also points to the evidence of male DNA of two contributors found in KP's cervix and vestibule swabs, which is consistent with KP's report of having had recent consensual sex with one male and being raped by another.

The State's evidence of penetration in this case was entirely circumstantial. KP basically had no recollection after falling asleep in the tent with appellant and ultimately waking up alone. There were no eyewitnesses. KP testified that she went to sleep with her pants on but did not have them on when she woke up in the morning. KP said she felt pressure in her vaginal area and thought she had been raped. Parrish testified, however, that KP had no vaginal injury but did report pain when Parrish swabbed KP's vestibule and cervical area. Although the DNA evidence from the internal swabs identified two male contributors, it did not establish that appellant was one of those contributors. Appellant's DNA was, however, identified as being on KP's mons pubis. Parrish testified that the mons pubis is swabbed for DNA because it is a "high traffic area" for friction during sexual intercourse or sexual assault.

As stated previously, "[p]enetration can be shown by circumstantial evidence, and if that evidence gives rise to more than a mere suspicion, and the inference that might reasonably have been deduced from it would leave little room for doubt, that is sufficient." Viewing the evidence in the light most favorable to the State, we cannot say that the circumstantial evidence of penetration is sufficient to sustain the rape conviction. We conclude that the jury would have had to resort to speculation and conjecture to decide that appellant penetrated KP based on this record. Accordingly, we hold there is insufficient evidence to support the rape conviction.

Our inquiry does not end here. When the proof offered supports a conviction on a lesser-included offense but not the offense the accused was convicted of, this court may

reduce the punishment to the maximum for the lesser offense, reduce it to the minimum for the lesser offense, or reduce it to the minimum for the lesser offense or something in between, depending on the circumstances. *Tigue v. State*, 319 Ark. 147, 152–53, 889 S.W.2d 760, 762 (1994); *see also Smith v. State*, 352 Ark. 92, 98 S.W.3d 433 (2003); *Inskeep v. State*, 2016 Ark. App. 135, 484 S.W.3d 709.

In his brief, appellant argues that the proof is also insufficient to support a conviction for second-degree assault for the same reasons asserted for the rape conviction. We disagree.

Here, the lesser-included offense of second-degree sexual assault relied on by the State is committed when a person engages in sexual contact with another person by forcible compulsion. Ark. Code Ann. § 5-14-125(a)(1) (Supp. 2021). Sexual contact means an "act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female[.]" Ark. Code Ann. § 5-14-101(12)(A). Appellant's DNA was found on KP's mons pubis. Parrish testified that this area is swabbed in sexual-assault cases because it a "high traffic area" during sexual intercourse or sexual assault. Although appellant claims that the DNA could have transferred from his belongings in the tent, KP testified that she went to sleep with her pants on and awoke with them off. Further, she woke up with extensive injuries to her face and neck, along with blood and vomit that were absent before she blacked out.

In conclusion, the evidence in this case supports a conviction on the lesser-included offense of second-degree sexual assault.

## B. Aggravated Assault

14

A person commits aggravated assault if, under circumstances manifesting extreme indifference to the value of human life, he or she purposely engages in conduct that creates a substantial danger of death or serious physical injury to another person. Ark. Code Ann. § 5-13-204(a)(1) (Supp. 2021). Appellant contends that the State's theory of the case was that KP went to sleep with no injuries and awoke beaten and strangled; appellant had been in the tent with her at some point in the night; and appellant must have been the person who beat and strangled KP. Appellant states that the evidence did not support this theory suggesting that there was no evidence that his hands were bruised or that KP's DNA was on the rope. As such, appellant argues that the jury was left to speculate that he caused KP's injuries.

The State responds that appellant's argument is not preserved for our review and, alternatively, that substantial evidence supports the conviction. As for preservation, the State argues that appellant moved for directed verdict after the State rested on the basis that the State failed to present any evidence to show he acted "purposely," and he renewed his motion at the close of the evidence. The State contends that appellant never argued that the State failed to present substantial evidence that he was the person who caused KP's injuries.

Appellant moved as follows:

> On aggravated assault, again, it's the same issues, Judge. They have the aftereffect evidence, the injury to [KP]. They have the testimony of [KP] of her pain in those areas and -- and the fact that she was with Mr. Morrison that night which has been demonstrated through some of their witnesses. But with respect to whether he engaged in conduct creating a substantial danger of death or serious physical injury to [KP] and did so under circumstances manifesting extreme indifference to the value

of human life, they have not proved that he had purpose, purposely, Your Honor. They have not proved that any ~ if he did do any of those that he did so with respect to his conduct that it was his conscious object to engage in behavior that would have caused a substantial danger of death or serious injury to [KP]. They've got more of the statements that he pulled on something in the dark, that he thought it was caught up on some other inanimate object in his tent. It was, in fact, [KP's] bag which he was trying to liberate from her. However, he did not – there's no evidence showing that he knew what he was pulling on was potentially around the neck of any person or [KP] or that he, in fact, caused those injuries that she sustained, that she had to her neck.

I believe they showed the injuries. I believe they showed that he was with her, but I don't believe they showed that he acted with purpose with respect to inflicting any injury, any injury which she sustained. For that reason I would argue that they have not made a prima facie case on the count of aggravated assault and ask for a directed verdict on that as well.

In his reply brief, appellant argues that he raised the issue in arguing that all the State had was evidence that he had been with KP at some point in the night and the "aftereffect evidence that KP was injured." He contends he raised the issue that "the State failed to prove [appellant] was the one who caused the injuries."

Arguments not raised below are waived, and parties cannot change the grounds for an objection on appeal but are bound by the scope and nature of the objections and arguments presented at trial. *Claggett v. State*, 2019 Ark. App. 208, at 4, 575 S.W.3d 169, 172. We conclude that the argument is preserved.

The evidence introduced at trial showed that appellant was deceptive with police officers at the outset of the investigation. When appellant first approached the tent on the morning of October 4, he asked Detective Keck who owned the tent. Detective Keck responded, "You're staying there, aren't you?" and appellant stated that a man and a woman

had stayed there the previous night. Appellant, during his interview, tried to explain why he did not inform them from the beginning that it was his tent, and appellant said he thought they knew. Appellant took the officers to the place where he said he saw the man and woman dispose of a bag and a knife, only to tell police later that it was he who did so. Although appellant initially denied being at the tent with KP, he eventually acknowledged that he had met KP, offered her food and something to drink, and invited her to sleep in his tent.

In his interview, appellant attempted to theorize what could have happened to KP. Appellant claimed in his interview that when he encountered KP, she said something about coming from an accident or that she was involved in an accident. Appellant also said he may not have seen the marks on her neck because she was wearing a bandana around her neck and suggested that she might have been using it to cover her neck. When detectives asked if KP was already hurt when he met her, appellant replied, "Yeah." However, when cross-examined by appellant's counsel as to whether she had any injuries before she went to sleep, KP replied, "No."

Appellant told detectives in his interview that a "possible strangulation" could have occurred when he was stealing KP's backpack. He acknowledged that stealing her bag was intentional but said that the bag being wrapped around something he could not see was "accidental." He also stated that he was not sure if one or both straps were hooked on KP, but he pulled with a "good 50 to 70-pound tug," considering that he weighs 350 pounds. He said he pulled on it "pretty hard" and "struggled with it for about a good three minutes" but

that it "eventually got free." Appellant acknowledged to the detectives that he pulled on the bag "pretty hard" and that the amount of force could have hurt someone.

Guilt may be established without eyewitness testimony, and evidence of guilt is not less substantial because it is circumstantial. *See, e.g.*, *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000). A defendant's false and inconsistent statements may be considered by the jury as circumstances tending to establish his or her guilt. *Hyatt v. State*, 2018 Ark. 85, at 12, 540 S.W.3d 673, 680. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *See, e.g.*, *Burley v. State*, 348 Ark. 422, 429, 73 S.W.3d 600, 605 (2002). A jury need not lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *Id.* at 431, 73 S.W.3d at 606. In light of these standards, there is sufficient evidence to support the conviction.

II. *Jury Instruction*

Last, appellant contends that if one or both of his convictions are not reversed based on sufficiency arguments, he is entitled to a new trial because the circuit court erroneously gave AMI Crim. 2d 206, which resulted in prejudice. The instruction stated that "[a] confession of a defendant will not warrant a conviction unless accompanied with other proof that the offense was committed or supported by substantial independent evidence establishing the trustworthy [sic] of the confession." The instruction is based on the corpus delicti rule, which provides that a confession of a defendant, unless made in open court, will

18

not warrant a conviction unless accompanied by other proof that the offense was committed. Ark. Code Ann. § 16-89-111(d) (Supp. 2021).

When the court went over the instructions with the parties, the following colloquy occurred:

THE COURT: Corroboration of confession.

DEFENSE: I don't think we need that. I don't think there is any confession.

PROSECUTOR: Your Honor, we don't.

THE COURT: Well, there's kind of a confession. He's talked about taking the backpack and pulling on the ~ pulling on the backpack straps. So I mean –

DEFENSE: Not to the charges as they are charged.

THE COURT: Aggravated assault's on there. Forcible compulsion's on there.

PROSECUTOR: Your Honor, I certainly would classify that as a quasi admission, Your Honor. So-

THE COURT: So any objection or you don't object.

DEFENSE: I still would like to object. I don't think that was a confession. I don't think it meets the standard for a confession.

THE COURT: All right. Well, the instruction says, "A confession of a defendant will not warrant a conviction unless accompanied with other proof that the offense was committed or supported by substantial independent evidence establishing the trustworthiness of the confession." I think that's what we have here. We've got him telling Sergeant Taylor – on two occasions he admits to pulling on the backpack strap, admits he did it for three minutes. He's 350 pounds. We've got elements of forcible compulsion. We got elements of aggravated assault. So I'm going to take that as a quasi confession. So I'm going to admit it, over your objection[.]

19

As he did below, appellant contends that he did not confess to any crime with which he was charged. He states that he told the police during his interviews that were played for the jury that KP's bag was caught on something when he tried to remove it from the tent causing him to pull it "quite hard" to "free it." Appellant surmised that this pulling on the bag could have caused the strangulation marks on KP's neck. He argues that the statement was not a "confession," adding that it was not an admission of any element of the charged crimes. The State responds that appellant did not object to his interview being played for the jury and characterizes his statements therein as a confession; thus, the circuit court did not err in giving AMI Crim. 2d 206.

A statement amounts to a confession only if there is an admission of guilt as to the commission of a criminal act. *Snyder v. City of DeWitt*, 15 Ark. App. 277, 692 S.W.2d 273 (1985). Here, appellant did not confess to the crimes for which he was charged. Therefore, we agree that because there was no confession, the court erred in giving AMI Crim. 2d 206.

Appellant asserts that the giving of an erroneous instruction is presumed to be prejudicial. In *Harmon v. State*, 2020 Ark. 217, at 14, 600 S.W.3d 586, 594, the supreme court addressed the presumption of prejudice from giving an erroneous instruction:

> An appellant is not required to demonstrate prejudice when the trial court gives an erroneous instruction involving the trial mechanism to be used in deciding a civil or criminal case. *Skinner v. R.J. Griffin & Co.*, 313 Ark. 430, 434, 855 S.W.2d 913, 916 (1993). However, we also explained that "an appellee may demonstrate that the giving of an erroneous instruction was harmless, and we would affirm. Some examples of this are where the jury demonstrably was not misled because the jury rejected the theory of the erroneous instruction, or where the erroneous instruction

20

was obviously cured by other correct instructions." *Id.* at 435, 855 S.W.2d at 916 (internal citations omitted).

*See also Napier v. State*, 74 Ark. App. 272, 276, 46 S.W.3d 565, 567–68 (2001). Appellant contends that prejudice from the instruction is "manifest and palpable" because the instruction suggested that appellant confessed to something. The State makes no harmless-error argument.

Because appellant did not confess to the crimes for which he was tried, the circuit court erred in giving AMI Crim. 2d 206. It is impossible to determine whether the jury was misled by the erroneous instruction, and we cannot say that the other instructions cured the erroneous instruction. Therefore, we reverse and remand for a new trial.

In conclusion, we hold that, although the evidence was insufficient to support the rape conviction, there was sufficient evidence of the lesser-included offense of second-degree sexual assault as well as and aggravated assault. However, because the circuit court erroneously instructed the jury on AMI Crim. 2d 206, and we cannot say that the jury was not misled by the error or that the other instructions cured the error, we reverse and remand for a new trial.

Reversed and remanded.

WOOD and HIXSON, JJ., agree.

*Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.